*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1624**

Gholamreza Kian,
Trustee for the Next of Kin of Sean Kian, Decedent,
Appellant,

vs.

City of Minnetonka, et al.,
Respondents.

**Filed June 15, 2015
Affirmed
Chutich, Judge
Dissenting, Rodenberg, Judge**

Hennepin County District Court
File No. 27-CV-13-18976

Steven Meshbesher, Richard Student, Meshbesher & Associates, P.A., Minneapolis, Minnesota (for appellant)

Paul D. Reuvers, Andrea B. Smith, Iverson Reuvers Condon, Bloomington, Minnesota (for respondents)

Considered and decided by Smith, Presiding Judge; Rodenberg, Judge; and Chutich, Judge.

## UNPUBLISHED OPINION

**CHUTICH**, Judge

While responding to an emergency call, Minnetonka Police Officer Daniel Aschenbrener speeded through a red light and struck Sean Kian's car. The collision

killed Kian. Appellant Gholamreza Kian, trustee for the next of kin of Sean Kian, brought a wrongful-death action against respondents City of Minnetonka (the city) and Officer Aschenbrener. The district court granted summary judgment to Officer Aschenbrener under the doctrine of official immunity and to the city on vicarious official immunity. Kian challenges the district court's decision, arguing that a genuine issue of material fact exists as to whether Officer Aschenbrener's actions were not covered by the doctrine of official immunity because they were willful and malicious. Because, as a matter of law, the willful-and-malicious exception does not apply under the facts present here, we affirm.

### FACTS

The facts underlying the fatal car crash are as follows. At approximately 9:30 p.m. on December 4, 2012, police received a 911 call regarding a young male with a history of aggression who was acting out of control and pushing family members. Officer Aschenbrener responded to the call and en route to the emergency turned on his police car's emergency lights and the Opticom emitter.[1]

While he was traveling westbound on Excelsior Boulevard to the emergency, Officer Aschenbrener learned that the young male appeared to be on drugs, had been committed to a psychiatric ward twice in the past year, and was looking for a gun to shoot himself. This report prompted Officer Aschenbrener to increase his speed. Officer Aschenbrener's police car video showed cars pulling over to the side of the road upon his

---

[1] The Opticom emitter allows emergency vehicles to gain a temporary right of way through intersections by communicating with traffic lights.

2

approach, and it showed that the roadways were dry, the night was clear, and traffic was relatively light.

Excelsior Boulevard has a posted speed limit of 40 miles per hour, and Officer Aschenbrener was traveling approximately 75 miles per hour six seconds before reaching the Woodland Road/Excelsior intersection. When Officer Aschenbrener approached the intersection, the video showed that the stoplight facing him was red, and the Opticom was solid white, demonstrating that it had started the light change sequence.

Sean Kian was traveling northbound on Woodland toward the intersection with Excelsior. A large church sign obscured the approach of Kian's car from Officer Aschenbrener's view. As Kian approached the intersection, the light facing him turned yellow, and the Opticom was flashing white. When Kian entered the intersection, the stoplight turned red and the Opticom continued flashing. Officer Aschenbrener's police car then collided with Kian's car, and Kian, who was not wearing a seat belt, was ejected from the car and fatally injured.

The parties dispute whether Officer Aschenbrener's siren was on at the time of the collision. A resident who lived near the intersection testified that he heard the crash but no siren. The resident maintained that he would have heard a siren because they echo in that area, and he has heard many in the past. Officer Aschenbrener testified that he turned the siren on en route to the emergency and other evidence in the record suggested that the siren was on before the crash.

The Minnesota State Patrol issued a Crash Reconstruction Report (the report) after the collision. The report stated that Officer Aschenbrener was "operating a fully marked

3

Minnetonka Police squad car with the lights and siren activated." It confirmed that Officer Aschenbrener "applied the brakes and swerved to the right in an attempt to avoid a collision as he entered the intersection on a red light." Officer Aschenbrener also testified that he tried to swerve out of the way when he saw Kian's car. The report further stated that Kian's car sustained damage consistent with being struck broadside. The report estimated that Kian's car was traveling 26 miles per hour at the moment of impact. Data from the police car's power-control module estimated that Officer Aschenbrener was traveling at 77 miles per hour approximately 216 feet before impact.[2]

The report concluded that Officer Aschenbrener caused the collision because "[t]he speed which [the police car] was traveling did not allow sufficient time for the traffic controller to complete the pre-emption cycle" and "[t]he point at which the BMW (Kian) could have observed the approaching emergency vehicle (approximately 88 feet from impact) would not have allowed sufficient time for Kian to perceive/react and avoid the collision."

In August 2013, Gholamreza Kian sued Officer Aschenbrener and the city for wrongful death, claiming willful disregard of duty, negligence, vicarious liability, and negligent training. Officer Aschenbrener and the city moved for summary judgment, arguing that Officer Aschenbrener was entitled to official immunity and the city was

---

[2] The report estimated that Officer Aschenbrener was traveling at 62 miles-per-hour leading up to the crash but as the report noted, this estimate conflicts with data from the squad car's power-control module. Because we construe the facts in the light most favorable to Kian in this summary judgment appeal, we assume that Officer Aschenbrener's police car was traveling at 77 miles-per-hour. *See Frieler v. Carlson Mktg. Grp., Inc.*, 751 N.W.2d 558, 564 (Minn. 2008).

entitled to vicarious official immunity. The district court granted summary judgment in favor of Officer Aschenbrener and the city and dismissed all four counts with prejudice. Kian appealed.

## DECISION

In an appeal from summary judgment, this court examines whether genuine issues of material fact exist and whether the district court's application of the law was erroneous. *Vassallo ex rel. Brown v. Majeski*, 842 N.W.2d 456, 462 (Minn. 2014). A genuine issue of fact exists when the evidence permits "reasonable persons to draw different conclusions." *Frieler*, 751 N.W.2d at 564 (quotation omitted). The evidence is viewed in the light most favorable to the nonmoving parties and all reasonable inferences are drawn in their favor. *Id.* The applicability of official immunity is a question of law that this court reviews de novo. *Vassallo*, 842 N.W.2d at 462.

Official immunity is a common-law doctrine. *Kari v. City of Maplewood*, 582 N.W.2d 921, 923 (Minn. 1998). It acts as a shield to protect public officials who perform duties that call for the exercise of judgment or discretion from being held personally liable for damages. *Schroeder v. St. Louis Cnty.*, 708 N.W.2d 497, 505 (Minn. 2006). The purpose of the doctrine is "to enable public employees to perform their duties effectively, without fear of personal liability that might inhibit the exercise of their independent judgment." *Vassallo*, 842 N.W.2d at 462. This doctrine is particularly important in emergency situations because those responding to emergencies must often make "quick decisions, often with imperfect information, in situations in which hesitation

5

or inhibition may result in significant harm to the public." *Id.* at 467 (Anderson, J. dissenting).

This court examines three factors to determine if official immunity applies: "(1) the conduct at issue; (2) whether the conduct is discretionary or ministerial and, if ministerial, whether any ministerial duties were violated; and (3) if discretionary, whether the conduct was willful or malicious." *Id.* at 462.

### *Conduct at Issue*

To determine whether Officer Aschenbrener can assert official immunity, this court must first identify the specific conduct at issue. *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11*, 678 N.W.2d 651, 656 (Minn. 2004).

Viewing the conduct at issue here—Officer Aschenbrener's driving—in the light most favorable to Kian, including assuming that the car's siren was not on, the record shows the following facts: Officer Aschenbrener responded to an emergency call and drove approximately 37 miles per hour over the speed limit; he turned on his Opticom emitter and flashing red lights; he approached an intersection with a red light and did not slow down; the Opticom emitter was flashing at Kian but had not yet completely changed the light; when Officer Aschenbrener approached the intersection where the crash occurred, a church sign obscured Kian's car from Officer Aschenbrener's view; when Officer Aschenbrener saw Kian's car, he braked and tried to avoid the collision; and Officer Aschenbrener's car broadsided Kian's car, ejecting Kian from the car and fatally injuring him.

6

*Discretionary or Ministerial*

We next turn to whether Officer Aschenbrener's conduct was discretionary or ministerial. "Whether a particular statute or policy creates a ministerial duty is ordinarily a question of law." *Vassallo*, 842 N.W.2d at 463. To determine whether an official's conduct is discretionary or ministerial, we must focus on the nature of the act. *Id.* at 462. "A discretionary duty involves individual professional judgment that necessarily reflects the professional goal and factors of a situation." *Id.* (quotation omitted). A ministerial duty "is absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed and designated facts." *Anderson*, 678 N.W.2d at 656 (quotation omitted).

Kian argues that Minnesota Statutes section 169.03, subdivision 2 (2014), Minnesota Statutes section 169.17 (2014), and Minnetonka Police Department Policy Manual Directive 305 (Minnetonka Police Directive 305) create a discretionary yet *mandatory* duty for Officer Aschenbrener to operate his police car with due regard for public safety.

The relevant statutes provide as follows. Section 169.03, subdivision 2, states:

> The driver of any authorized emergency vehicle, when responding to an emergency call, upon approaching a red or stop signal or any stop sign shall slow down as necessary for safety, but may proceed cautiously past such red or stop sign or signal after sounding siren and displaying red lights, except that a law enforcement vehicle responding to an emergency call shall sound its siren or display at least one lighted red light to the front.

Similarly, section 169.17 states that posted speed limits do not apply to drivers of authorized emergency vehicles when responding to an emergency call but acknowledges that this exception does not "relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of persons using the street, nor does it protect the driver of an authorized emergency vehicle from the consequence of a reckless disregard of the safety of others."

The relevant departmental policy, Minnetonka Police Directive 305, states:

> The judicial system has often determined that even if an officer has been responding to an emergency situation, the officer is not relieved of the responsibility of operating an emergency vehicle with due regard for the safety of others using the road way. While allowed to violate certain traffic laws, officers must do so in a manner that will not jeopardize the safety of others. Exceeding the speed limit must be done with the utmost caution.

Kian's argument—that these statutory and departmental authorities create discretionary yet mandatory duties—appears to ask this court to construe these authorities as creating a ministerial duty for an officer to operate his car with due regard for public safety. But the parties stipulated that Officer Aschenbrener was exercising a *discretionary* duty. Most importantly, in *Vassallo*, the supreme court examined similar departmental[3] and statutory authorities[4] and concluded that an officer's decision to slow down as necessary for safety was a "textbook example of the exercise of discretion." 842

---

[3] The departmental policy at issue in *Vassallo*, Hennepin County Sheriff's Office Policy 6-402, states, "Deputies are required to drive with due regard for the safety of all persons." 842 N.W.2d at 461 n.3.
[4] *Vassallo* specifically examined section 169.03, subdivision 2—the same statute that Kian cites here. 842 N.W.2d at 463.

8

N.W.2d at 463-64. In addition, *Vasallo* held that the relevant statute did not require both the use of a siren and flashing red lights; rather, the use of one of these methods was sufficient.[5] *Id.* We therefore conclude that Officer Aschenbrener's conduct was discretionary.

Our inquiry does not end here, however. We must also determine whether a genuine issue of material fact exists as to whether Officer Aschenbrener acted willfully or maliciously.

### Willful or Malicious

When an official undertakes a discretionary action, he "is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." *Vassallo*, 842 N.W.2d at 462 (quotation omitted). Malice is "the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right." *Id.* at 465 (quotation omitted). The terms willful and malicious are synonymous in the context of official immunity. *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991).

Generally, whether malice exists is a question of fact for the jury. *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 664 n.5 (Minn. 1999). But if no genuine issue of material fact exists, the court may decide whether the officer acted maliciously as a matter of law. *See Vassallo*, 842 N.W.2d at 465. "In order to find malice, the court must find that the

---

[5] Given this result, the factual issue of whether Officer Aschenbrener had turned on his siren is not a genuine issue of material fact to preclude summary judgment.

9

wrongful act so unreasonably put at risk the safety and welfare of others that as a matter of law it could not be excused or justified." *Id.* (quotation omitted).

Kian argues that the district court erred in determining that no genuine issue of material fact exists. Officer Aschenbrener and the city respond that *Vassallo* controls and no genuine issue of material fact shows that Officer Aschenbrener acted willfully or maliciously. After carefully examining the record and the police car video from the accident, we agree with Officer Aschenbrener and the city.

In *Vassallo*, a police officer was responding to an emergency call and traveling at 54 miles per hour in a 50 mile-per-hour speed zone. *Id.* at 460. Because of a recent snowfall, road conditions were poor. *Id.* Shortly before entering an intersection, the officer had turned off his siren to avoid alerting the suspects of his approach; his emergency lights remained on. *Id.* The officer then entered the intersection on a red light and collided with a car coming from the opposite direction. *Id.* The officer did not see the car until the last minute and swerved to avoid it. *Id.*

The district court granted summary judgment in favor of the officer, determining that his actions were not willful or malicious as a matter of law. *Id.* at 465. The supreme court affirmed, relying on the "undisputed facts" that the officer "simply failed to see [the other] car until the last minute, and then made every effort to avoid [it]." *Id.* The supreme court also noted that no evidence showed that the officer willfully or maliciously violated a known right. *Id.* (citing *Kari*, 582 N.W.2d at 925).

Here, similar to the officer in *Vassallo*, Officer Aschenbrener exceeded the speed limit while responding to an emergency call, entered an intersection on a red light with

10

his flashing red lights on and siren off, and collided with another car. And like the officer in *Vasallo*, Officer Aschenbrener simply did not see Kian's car until the last second and tried to avoid the collision.

Kian and the dissent contend that *Vassallo* is distinguishable because the responding officer in *Vassallo* was only driving four miles per hour above the speed limit, Officer Aschenbrener had been previously reprimanded in 2011 for driving too fast when responding to a burglary report, and the officer in *Vassalo* had a good reason to proceed without a siren through the intersection. But these distinctions are not persuasive and attempt to lower the high bar of willful-and-malicious behavior to conduct that is merely negligent.

Negligence, however, is not malice; malice requires "proof of a *wrongful* invasion of the rights of another." *Kelly*, 598 N.W.2d at 663 (emphasis added). This bar is set high in recognition of the difficult job that police officers perform. *See Vassallo*, 842 N.W.2d at 462-63. It is even more difficult to characterize an officer's decision as willful or malicious when the officer is performing a discretionary act that requires the exercise of independent judgment and offers "little time for reflection." *Pletan v. Gaines*, 494 N.W.2d 38, 41 (Minn. 1992).

In rare cases, we have identified potentially willful or malicious conduct that has created a genuine issue of material fact for a jury. *See, e.g.*, *Soucek v. Banham*, 503 N.W.2d 153 (Minn. App. 1993). For example, in *Soucek*, Minneapolis police received two separate reports from people claiming that they saw a wolf. *Id.* at 156. Later that night, several officers located the "wolf" and within one-and-a-half minutes had shot the

11

animal between 7 and 18 times. *Id.* The officers afterwards posed for trophy photos with the animal, later identified as a German Shepard mix, and witnesses said that the officers bragged about shooting a dog. *Id.* at 157-59. This court affirmed the denial of summary judgment, concluding that a genuine issue of material fact remained regarding the officers' intent under the willful-and-malicious exception, and specifically whether the officers truly believed the animal was a wolf, rather than a pet dog, when they shot it many times. *Id.* at 160-61.

*Soucek* stands in stark contrast to the circumstances here. Even when all the facts are construed in favor of Kian, the record simply does not show that Officer Aschenbrener's actions could rise to the level of willful or malicious. Officer Aschenbrener made a discretionary judgment call to increase his speed when he learned of escalating danger during a domestic dispute. But driving at high speeds in response to an emergency is not by itself unreasonable. *Cf. Pletan*, 494 N.W.2d at 40-41 (holding that an officer who pursued a shoplifting suspect in a high-speed car chase was protected by official immunity).

Nothing in the record suggests that Officer Aschenbrener intended to drive in a manner that jeopardized public safety or that his response to a grave emergency so unreasonably put at risk the safety of others that it could not be justified. Unlike in *Vassallo*, where the officer entered at intersection against a red light at 54 miles per hour under poor road conditions, 842 N.W.2d at 460, the road conditions for Officer Aschenbrener were clear and dry. The officer turned on his flashing red lights and Opticom emitter, his police car was never out of control, drivers were safely pulling to

12

the side of the road in front of him, and the intersection that he was entering appeared clear until the very last seconds before the crash.

Officer Aschenbrener's decision to speed to arrive at the scene of an emergency is akin to an officer's decision to engage in a high-speed car chase. And in the context of high-speed car chases, the supreme court has said:

> Admittedly, a high-speed car chase can be dangerous, not only to the pursuer and the pursued, but also to uninvolved members of the public using the highways. Even so, the community imposes a duty on its . . . law enforcement officers to provide its citizens with security in person and property from lawless people, and this duty, on occasion, necessarily will involve high-speed car chases. Official immunity is provided because the community cannot expect its police officers to do their duty and then to second-guess them when they attempt conscientiously to do it.

*Pletan*, 494 N.W.2d at 41.

Kian's death was a tragedy, and our decision today does not suggest that an officer's driving in response to an emergency can never be willful or malicious. We are, however, mindful of the discretion given to officers in these emergency-response situations because "[t]o expose police officers to civil liability whenever a third person might be injured would, we think, tend to exchange prudent caution for timidity in the already difficult job of responsible law enforcement." *Id*.

Kian finally contends that the city cannot assert vicarious official immunity. Given our conclusion above, we determine that vicarious official immunity extends to the

13

city. *See id.* at 43 (holding that in high-speed police pursuits, the officer's official immunity extends to the officer's public employer).

**Affirmed.**

**RODENBERG**, Judge (dissenting)

Because there is a genuine issue of material fact concerning whether Officer Aschenbrener's driving conduct amounted to a willful violation of a known right, I respectfully dissent. I would reverse the grant of summary judgment and remand this case for trial.

The majority correctly characterizes Officer Aschenbrener's decision to drive through the red light as discretionary and therefore proper for the application of official immunity unless the officer was "guilty of a willful or malicious wrong." *Vassallo ex. rel. Brown v. Majeski*, 842 N.W.2d 456, 462 (Minn. 2014) (quotation omitted). And the majority rightly acknowledges that the question of whether malice exists is one of fact, and therefore ordinarily a question for resolution by the jury. *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 664 n. 5 (Minn. 1999); *see also Elwood v. Rice City*, 423 N.W.2d 671, 679 (Minn. 1988). Summary judgment on this issue is appropriate only if it can be said as a matter of law that the officer's conduct was not willful or malicious. *Vassallo*, 842 N.W.2d at 465, *citing Kari v. City of Maplewood*, 582 N.W.2d 921, 925 (Minn. 1998). Respectfully, the conduct of Officer Aschenbrener is such that, viewing the facts in the light most favorable to appellant, it cannot be said as a matter of law that the officer's conduct was not willful or malicious. On this record, the question is one of fact, appropriate for resolution after trial.

While I agree with the majority that the focus of our inquiry must be on the officer's driving conduct on the night in question, the determination of whether a person's conduct is willful or malicious cannot be made in a vacuum. Officer

D-1

Aschenbrener had a history of driving at speeds that his own department determined to be "extremely unsafe and unnecessary." He was disciplined for excessively fast driving in August, 2011, just 15 months before this crash. The supervisor who issued that disciplinary action testified in his deposition that Officer Aschenbrener "agreed that he was simply driving too fast [in response to a burglary report] and at speeds that clearly put himself and others at risk." Officer Aschenbrener's performance evaluations before this collision also noted his involvement in an at-fault crash where the officer hit a guardrail. His 2012 performance evaluation numerically evaluated his driving skills as "1," corresponding to "poor" driving skills. And the performance evaluation for the year before rated his driving skills at only a "2." This history of discipline for "extremely unsafe" driving put Officer Aschenbrener on notice that his propensity to drive dangerously would, if continued, put both himself and the driving public at unreasonable risk.

In *Vassallo*, a recent case from the Minnesota Supreme Court, an officer was found entitled to official immunity after proceeding through a red light and crashing into a motorist who had a green light and who apparently did not see the officer approaching and entering the intersection. 842 N.W.2d at 460. But *Vassallo* is distinguishable from this case in several important ways.

Unlike the situation in *Vassallo*, Officer Aschenbrener was not driving just a few miles per hour over the posted speed limit. Officer Aschenbrener's testimony about when and if he engaged his brakes before the collision conflicts with available crash data. Further, Officer Aschenbrener's version of what happened conflicts with testimony of a

nearby resident concerning whether the officer was using his squad's siren. These disparities could lead a fact-finder to conclude that Officer Aschenbrener's recitation of the incident is not credible. The evidence is conflicting concerning precisely how fast the officer was driving at various points in time before the fatal crash. But viewing the evidence in the light most favorable to the non-moving party, the officer was continuing to accelerate as he approached the red light, reaching speeds as fast as 79 miles per hour in a 40-mile-per-hour zone, and was still driving 77 miles-per-hour until he braked 1.2 seconds before impact. He was driving so fast that the Opticom did not have time to turn his red light to green – and the dash-cam recording shows this to have been clearly visible to the officer as he approached the intersection where Mr. Kiam was killed. Despite having been discliplined earlier for creating unreasonable risks on account of excessively fast driving, Officer Aschenbrener accelerated toward this intersection to speeds of close to 80 miles per hour – nearly double the posted speed limit – so fast that he was outdriving the Opticom. Since his light remained red, he knew that cross traffic would proceed into this intersection with the right-of-way. And that is exactly what Mr. Kian was doing when he was killed. The Minnesota State Patrol reconstruction report concluded that Mr. Kian approached the intersection having a green light and "entered the intersection on a yellow light." Even after 22 feet of skidding through the red light, Officer Aschenbrener was still travelling at 57 miles per hour at the time of the crash that killed Mr. Kian.

Another distinction between this case and *Vassallo* concerns the non-use of the squad car's siren. Unlike *Vassallo*, in this case there is a factual dispute about whether

the officer was using his siren and the officer makes no claim that he made a discretionary decision not to use the squad's siren. Here, Officer Aschenbrener claims to have been using the squad's siren before the crash. But a citizen who lives near the crash site heard the crash and went immediately to the intersection to render aid. That citizen testified by deposition that he did *not* hear a siren before the crash, despite his house being situated such that he can hear sirens when used by emergency vehicles at and through that intersection. The squad car video – on which there is no audio – and the other available objective data are insufficent to resolve this factual dispute concerning the siren. Unlike *Vassallo*, where the officer had a reason not to be using the squad car siren because he was getting close to the location where a security alarm had sounded and did not want to alert burglars to his approach to the house, *id.*, in this case there is no claim that the officer made a discretionary decision not to use the squad car's siren. As he hurtled toward the intersection where Mr. Kian was killed, travelling at speeds approaching those about which he had previously been warned as being "extremely unsafe," Officer Aschenbrenner claims to have had his siren on. But this fact issue is very much in dispute. And the procedural posture of this appeal requires us to interpret the factual record in the light most favorable to the party seeking summary adjudication. *See Grondahl v. Bulluck*, 318 N.W.2d 240, 242 (Minn. 1982) (requiring that, on an appeal from summary judgment, the evidence be viewed in the light most favorable to the non-moving party).

*Vassallo* instructs that malice is "the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right."

*Id.* at 465.  Malice may be found in an officer's actions that are such as to unreasonably put at risk the safety of the driving public without excuse or justification.  *Id.*  There is enough evidence in this record to support a jury finding that Officer Ashenbrener's conduct was more than negligent and amounted to a willful or malicious wrong.

None of this is to say that a jury would find Officer Aschenbrener's conduct to be willful or malicious.  To be sure, there is evidence from which a jury might well conclude that there was no willful or malicious conduct and that Officer Aschenbrener and the city are therefore entitled to official immunity.  The jury might well find that Officer Aschenbrenner was using his siren.  It might decide that the officer's speed was not as great as appellant claims.  But that is what trials are for.  Where the evidence would support a finding that an officer who was previously disciplined for high-speed and dangerous driving replicates that sort of high-speed driving in a circumstance where the officer is driving so fast that the Opticom system cannot keep up with the speed of his squad car, and the officer nevertheless, without using a siren, intentionally proceeds through a red light at what is obviously an obscured intersection, I would reverse the grant of summary judgment and remand for trial.